BIAGIO AMALFI, Respondent, *v.* POST & MCCORD, INCORPORATED, and HEGEMAN-HARRIS CO., INC., Appellants.

First Department, March 25, 1937.

*Benjamin C. Loder* of counsel [*G. Everett Hunt* and *William G. Walsh* with him on the brief], for the appellant Post & McCord, Incorporated.

*Walter L. Glenney* of counsel [*Pettigrew & Glenney*, attorneys], for the appellant Hegeman-Harris Co., Inc.

*John C. MacCarthy* of counsel [*Bose & MacCarthy*, attorneys], for the respondent.

Cohn, J. The action is for damages for personal injuries caused by the alleged negligence of defendants. After a trial before the court and a jury, plaintiff on February 14, 1936, obtained a verdict against defendants in the sum of $25,000. The judgment entered thereon was unanimously affirmed in this court and leave to appeal to the Court of Appeals was denied both in this court and in the Court of Appeals. (248 App. Div. 864; 249 id. 615, 616; 273 N. Y. 677.)

Plaintiff, a carpenter's helper employed by the Knickerbocker Fireproofing Company, was injured on August 17, 1932, while working on the thirty-second floor of a building in the course of construction in Radio City. Defendant Post & McCord, Incorporated, installed the steel work on the building, and defendant Hegeman-Harris Co., Inc., superintended its construction. At the trial plaintiff claimed that his injuries were received when he was struck on the head by a piece of iron which had fallen from above the thirty-sixth floor and which he claimed was under the control of defendant Post & McCord, Incorporated. Defendants asserted that plaintiff was injured by a plank which had dropped from a bundle of boards he himself was hoisting to an upper floor in the course of his work as a laborer. Plaintiff received a deep angular laceration on the left side of the scalp two and one-half inches long on one side and one inch long on the other. The skull showed no fraoture. He was confined to the Reconstruction Hospital for several months immediately following the accident, and later he remained at another hospital for an additional period.

Defendants claim that the order denying the motion for a new trial was erroneous because the alleged newly-discovered evidence showed (1) that plaintiff was injured in the manner claimed by defendants at the trial; (2) that plaintiff was guilty of fraudulent misrepresentations as to his physicial condition, and (3) that he was otherwise guilty of deceit. Plaintiff urges that the alleged newly-discovered evidence as to the happening of the accident could have been obtained upon the trial by the exercise of reasonable diligence; that the evidence as to alleged fraud concerning plaintiff's injuries is cumulative; that the evidence as to other deceit was at most impeaching, and that in any event there would be no change in the result at a new trial.

In considering this appeal, we shall take up each branch of the motion separately.

(1) As to the manner in which the accident occurred:

Plaintiff's version was established at the trial by the testimony of two witnesses who testified that they saw a piece of iron, black in color, fall from above the thirty-second floor of the build-

ing through the shaftway at which plaintiff was working; a third witness testified that near the place plaintiff was standing when struck, he found a piece of iron covered with blood. In support of their view of the manner in which plaintiff was injured, defendants offered evidence of admissions by plaintiff to various persons made immediately after the occurrence of the accident, to the effect that he had been injured by a fall of one of the boards he was engaged in hoisting.

The newly-discovered evidence as to this phase of the case consists of affidavits of two witnesses, fellow employees of plaintiff, who swear that at the time plaintiff was hurt they were working on the job on the thirty-second floor. One of them, Vincenzo de Fillippo, was about six feet away while plaintiff was raising a bundle of boards to the floor above when he heard someone in the shaftway say, "Look out down below," and, as he looked, he saw plaintiff struck on the head by a piece of board like the kind plaintiff was pulling up through the hoistway. Gabriel Novelli, the other alleged eye-witness, states that he was standing fifteen to eighteen feet from the shaftway and that he, too, saw a board fall on plaintiff's head. Defendants explain the failure to call these two witnesses at the trial by stating they had no knowledge of their existence; that their evidence was discovered through the help of one Joe Salzillo, who on November 10, 1936, telephoned an official of defendant Post & McCord, Incorporated, to the effect that he had information concerning the occurrence of the accident; that defendants were unable to obtain the testimony of these witnesses because these men were under definite instructions to give information to no one for fear of involving their own employer.

(2) As to plaintiff's physical condition:

There was a sharp contest as to the nature, character and extent of plaintiff's injuries and of his disability. In fact, almost 200 pages of medical testimony appear in the record upon this issue. Two physicians testified in behalf of plaintiff and five for defendants. We quote from the testimony of plaintiff's first medical witness:

"At that time [January 6, 1933], he [plaintiff] presented much the same picture as he does at the present time. He was walking with difficulty, with a rather lateral progression, dragging or pushing the left side, with a weakness of the entire left side of the body; the head drawn to the right in a spastic condition, over the right shoulder; generalized tremor, especially of the muscles of the head and face, with a loss of sensation throughout the entire left side of his body, so that he could feel practically nothing in the line of stimulation such as electricity, pin, temperature — were all absent.

At that time he had difficulty in his vision, having difficulty in looking sideways, or moving his head to the left. * * * He also showed a diminution or almost a complete loss of smell and taste, and still does, and a diminution of hearing on the left side."

The other medical witness for the plaintiff, a neurologist, examined plaintiff the night of February 6, 1936, and testified the next day that he found plaintiff suffering from a brain injury which caused a " stiff, guarded gait," kept his head turned to the right, induced double vision, constant twitching of his scalp and a loss of sensitiveness and weakness on the left side of the body, together with a disability in hearing. Each doctor for the plaintiff, respectively, swore that in his opinion, with reasonable certainty, plaintiff's condition was a permanent one, and the neurologist stated that no treatment that he knew of could cure the condition from which plaintiff was then suffering.

Testifying in his own behalf, plaintiff stated that his left side, left leg and left arm were weak, that he had difficulty with his head, neck, eyes, ears, left arm and leg, and that he required the aid of a cane in walking.

Dr. Ludlum, Dr. Bassen, Dr. Cole, Dr. Loverme and Dr. Peterson, the last a neurologist, were the medical witnesses called by defendants. Dr. Ludlum testified that within several weeks after he had received his injury, and while still at Reconstruction Hospital, plaintiff appeared to be stricken with physical and mental collapses which were feigned and that he was suffering not from brain injury or organic brain condition, but from hysteria. Dr. Peterson, testifying as to examination of plaintiff made on August 23, 1932, said that his impression at that time was that plaintiff's symptoms were greatly exaggerated and that when he examined him again on September 27, 1932, plaintiff was unco-operative and on October fifteenth, when plaintiff complained of double vision, he found that such claim appeared to be without foundation. Dr. Bassen testified that he examined plaintiff on February 15, 1933, and found nothing wrong with his eyes. Dr. Cole testified that the X-ray plates made in February, 1933, showed nothing more than rheumatism of long standing, and Dr. Loverme, the first-aid doctor who saw plaintiff on the day of the accident and who examined him again on May 15, 1935, testified that plaintiff was suffering from hysteria and not from any brain injury.

In the moving papers defendants charge fraud and misrepresentation by plaintiff as to his physicial condition. This they seek to establish by the affidavit of Merritt D. Padfield, an employee of the United States government in the Immigration-Naturalization Service. He swears that in May, 1936, he sought to execute a

warrant of arrest upon plaintiff at his residence and for that purpose went to his home, identified himself and informed plaintiff that it would be necessary to take him to Ellis Island, but plaintiff refused to go, pleading that his physical condition was such that he could not be taken there, and groaning as if in great pain all over his body. Padfield then states that he told plaintiff he was going to call for some one to help remove plaintiff and would return in fifteen minutes; that he left the apartment, went into the street, concealed himself behind an automobile parked against the curb and watched the doorway leading to the building in which plaintiff lived; that after the lapse of a short time, plaintiff appeared in the doorway with cane in hand held horizontally, looked up and down the street, then hurriedly left the doorway, walking very fast without any limp; that he, Padfield, ran toward Amalfi to apprehend him, took hold of his coat and collar, attempted to stop him but plaintiff by superior strength pulled away and threw the government agent to his knees, and that it was with great difficulty that he and a detective, who had come to his assistance, were finally able to force plaintiff into the officer's automobile. Padfield swears that he thereafter took plaintiff to the police station at One Hundred and Fourth street, had him booked as a violator of the United States Immigration Law, and then took him to Ellis Island; that during all the time plaintiff was in his charge he walked normally, frequently holding his cane horizontal to the sidewalk and that when it was necessary to climb the elevated stairs to take the " L " from Harlem down to South Ferry and later to descend steps, plaintiff walked briskly and without any discernible impairment of any kind.

Plaintiff in his answering affidavit makes no denial of the facts regarding his arrest, except to state that he was using his cane as he always had since the accident; that he did limp; that at no time was there any struggle between him and the immigration officer and that he left his apartment to go to the street on the occasion of Padfield's visit, to reach his lawyer by telephone.

(3) As to plaintiff's deceit in other matters:

The sworn statement of Jules L. Mallay, an investigator, shows that plaintiff was receiving home relief while he had on deposit funds in a bank in New York city and that he was making remittances to Italy; that upon this charge he was arrested but the charge was dismissed. Plaintiff in his answering affidavit confesses that he made full restitution to the city.

The claim is also made by defendants that plaintiff's real name is Pasquale Cecere and not Biagio Amalfi. This, plaintiff now admits but he says that he used the name of Biagio Amalfi because

a person with the latter name had a union card in the carpenters' union and when that person left this country for Italy he gave the card to plaintiff who used it for the purpose of getting a job. Plaintiff asserts that this misrepresentation as to the name was immaterial and was used by him solely for the purpose of securing employment. It is to be noted that at the trial he was specifically asked whether or not he ever went under the name of Pasquale Cecere and somewhat reluctantly he admitted that he had worked under that name on some bricklaying job.

Upon all the proof submitted, we are of the opinion that the trial court should have granted a new trial on the ground of the newly-discovered evidence.

At the trial held in February, 1936, several years after the occurrence of the accident, the picture presented by plaintiff is that of a disabled and decrepit person. The jury is told that plaintiff walks with extreme difficulty, dragging or pushing his left side; that he suffers a loss of sensation in the entire left side of the body; that his head is drawn to the right shoulder; that he is afflicted with impairment of the senses of sight, smell, taste and hearing and that plaintiff's disabilities and injuries are permanent in character. It can readily be understood why, in the light of that testimony, a verdict is rendered for plaintiff in the sum of $25,000. The alleged startling change in plaintiff within three months after the rendition of the jury's verdict, as portrayed by the affidavit of Mr. Padfield, the government employee, who appears disinterested, convinces us that defendants' charge of fraud and misrepresentation by plaintiff as to his injuries may be far from baseless. Evidence of plaintiff's pretenses as to pain and suffering; of his sudden agility and strength in an endeavor to escape arrest by the government official, of a complete absence of any discernible physical impairment in all the time that plaintiff was in this officer's custody, if established, are facts of vital importance. Such newly-discovered evidence of plaintiff's physical condition, if believed, will undoubtedly have a decided bearing upon the outcome at another trial and in and of itself is sufficient to warrant the setting aside of this verdict. (*Jensen* v. *Hamburg-American Packet Co.,* 23 App. Div. 163, 169.)

The law as to what must be shown to entitle a party to a new trial on the ground of newly-discovered evidence has been succinctly stated by this court in the case of *Frohlich* v. *Zeltzer* (185 App. Div. 103, at p. 109), as follows: " It must appear that the evidence was not and could not have been discovered in the exercise of reasonable diligence before the trial, that it is material and not merely cumulative or of an impeaching character in the sense of affecting credibility

only as distinguished from having probative force by showing a different state of facts and that on a new trial it would probably change the result. (*Bonynge* v. *Waterbury*, 12 Hun, 534; *Thompson* v. *Welde*, 27 App. Div. 186; *Keister* v. *Rankin*, 34 id. 288; *Hess* v. *Sloane*, 47 id. 585; *Klinger* v. *Markowitz*, 54 id. 299.) "

We are of the opinion that defendants here have shown that the newly-discovered evidence as to plaintiff's physical condition meets the foregoing test.

If it be true that plaintiff has by fraud or misrepresentation obtained a verdict which in justice he should not have received, the court will not hesitate to use the power it possesses to right the wrong by vacating the judgment obtained and directing a new trial. (*Nugent* v. *Metropolitan Street R. Co.*, 46 App. Div. 105.)

The order appealed from should accordingly be reversed and the motion to set aside the judgment and for a new trial granted, with costs to the appellants to abide the event.

MARTIN, P. J., MCAVOY, O'MALLEY and DORE, JJ., concur.

Order unanimously reversed and the motion to set aside the judgment and for a new trial granted, with costs to the appellants to abide the event.